UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-22237-Civ-COOKE/TORRES

KOL B'SEDER, INC.,
a Florida Corporation,

     Plaintiff,

vs.

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON SUBSCRIBING
TO CERTIFICATE NO.154766
UNDER CONTRACT NO.
B0621MASRSWV15BND, and
GLASS-TECH CORPORATION,
A Florida Corporation

     Defendants.
_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This is an admiralty action stemming from the partial submersion of a yacht at a boatyard on the Miami River. Plaintiff Kol B'Seder, Inc. ("Kol B'Seder") brings suit against Defendant Certain Underwriters at Lloyd's of London subscribing to Certificate No. 154766 under Contract No. B0621MASRSWV15BND ("Underwriters") alleging breach of insurance contract, and against Defendant Glass-Tech Corporation ("Glass-Tech") alleging breach of contract, breach of warranty of workmanlike performance, and negligence. (ECF No. 76 ¶ 1). I have jurisdiction under 28 U.S.C. § 1333.

Pending are (1) Certain Underwriters' Motion for Final Summary Judgment (ECF No. 66), and (2) Glass-Tech's Motion for Summary Judgment Against Plaintiff & Motion for Summary Judgment Against Counter-Defendant (ECF No. 69). For the reasons that follow, I grant the Motions.

### BACKGROUND

Kol B'Seder bought the M/Y *Sababa*, a now eighteen-year-old motor yacht, in 2002. (ECF No. 76 ¶ 2; ECF No. 53-1 at 15, 17). It did so planning eventually to offer charters to and from the Bahamas. (ECF No. 53-1 at 43-45). In the years

1

following the purchase, Kol B'Seder's principal owner, Noreen Sablotsky, docked the yacht at her waterfront home (*Id.* at 62-63) and operated it in and around Biscayne Bay, the Miami River and, occasionally, the Bahamas. (*Id.* at 16). During the period relevant to this lawsuit, Kol B'Seder insured the vessel through Underwriters.[1] (ECF No. 79-1).

Prior to the *Sababa*'s partial submersion, Sablotsky did not know how often a vessel should undergo routine maintenance or be hauled out of the water for repairs.[2] (*Id.* at 170-74). But she claims that someone checked the *Sababa*'s engines and bilge systems weekly (*Id.* at 19, 116, 119), and that a scuba diver cleaned the yacht's hull monthly.[3] (*Id.* at 33). Despite those efforts, the passage of time was not kind to the *Sababa*. In 2008, she had engine trouble that took two years to fix. (*Id.* at 39). Also in 2008, the vessel required work on its rudder. (*Id.* at 132-34; ECF No. 68-2 at 16-18). In 2012, the vessel again had engine problems that required extensive repair work. (ECF No. 53-1 at 41, 135-40). It had repairs to its hull in April 2013 (*Id.* at 34-43; 135-40),[4] and in August 2015, Sablotsky's diver told his boss the yacht needed a haul-out. (ECF No. 68-4 at 17-18, 38).

Then, in March 2016, Sablotsky claims the *Sababa* touched bottom in a channel leading to Biscayne Bay. (*Id.* at 63). Sablotsky says she did not feel an impact sufficient to suspect damage, and surmised that the vessel's propellers had simply kicked up mud. (*Id.* at 23-26, 63, 69, 71-72). She therefore did not stop to determine whether touching bottom affected the integrity of the hull. (*Id.* at 70-71). She also did not inform Underwriters of the incident. (ECF No. 66 ¶¶ 28, 30).

Sablotsky testified that by that point, the *Sababa* had mechanical problems

---

[1] The Underwriters policy at issue – The SeaWave Yacht Insurance Policy [Certificate 154766] (the "Policy") – was effective during the period from January 23, 2016 to January 23, 2017. (ECF No. 79-1).

[2] Sablotsky came to learn that the recommended period between haul-outs is twelve to eighteen months. (ECF No. 53-1 at 174).

[3] Sablotsky kept few maintenance records or logbooks for the vessel. (ECF 53-1 at 19, 33).

[4] This haul-out was the last time the vessel had a visual inspection or any bottom work done before its partial submersion. (ECF No. 53-1 at 34-43, 135-40).

2

nearly every time she took it out. (ECF No. 53-1 at 43-47, 144-46). "Something kept – kept going wrong" (*Id.* at 45), "it just was never ending." (*Id.* at 144-46). In her view, the vessel was not seaworthy to travel in the open seas: "And the boat, if you look at the – was seaworthy to the point of getting – I got insurance and it was safe in that it wasn't going to sink. But it was – it wasn't seaworthy to go anywhere, to the Bahamas. So I had a long list of things to do." (*Id.* at 43).

Sablotsky wanted the *Sababa* ready for trips to the Bahamas (*Id.* at 81-82), so she finally arranged to take it to Glass-Tech for a haul-out. (*Id.* 85-86). On April 29, 2016, a Friday, Sablotsky left the dock at her home and piloted the vessel to Glass-Tech's boatyard. (*Id.* at 153-58). On the way, she sent Glass-Tech owner Nelson Fernandez a text message asking if it was "[s]till ok to bring boat today?" (ECF No. 71-1 at 1). Fernandez texted back that she could "bring it over." (*Id.*). She asked, "can we be there at like 1:30?" (*Id.*). Fernandez responded, "Yes. That's fine. I may not be able to haul till Monday. But it will at least be there and so we can haul it Monday. So bring it over when u can."[5] (*Id.*).

The *Sababa* arrived at the boatyard early that afternoon. (ECF No. 68-2 at 67-68). Sablotsky pulled alongside another vessel already tied to the dock (*Id.* at 158), and two boatyard employees caught and tied her lines to the other vessel. (*Id.* at 158-62). Sablotsky confirmed the work she wanted performed, gathered her belongings, and left. (*Id.*).

By her own admission, Sablotsky did not:
- Advise Glass-Tech that the *Sababa* had not been hauled out for bottom maintenance in more than three years (*Id.* at 84-85);
- Advise Glass-Tech of the poor condition of the vessel (*Id.*);
- Advise Glass-Tech that she believed the vessel had run aground a month earlier (*Id.*);
- Instruct anyone at the boatyard to plug the vessel into shore power (*Id.*); or
- Plug the vessel into shore power herself. (*Id.*).

---

[5] Sablotsky admits that she understood that Glass-Tech might not haul the boat out until after the weekend. (ECF No. 53-1 at 89-90).

3

As Fernandez had anticipated, Glass-Tech did not end up hauling the *Sababa* out on April 29, 2016. (ECF No. 76 ¶ 10). Two days later, on Sunday, a boatyard security guard discovered the vessel partially submerged. (ECF No. 68-2 at 30). Glass-Tech informed Sablotsky (ECF No. 53-1 at 91, 164 & Ex. O at 89), lifted the vessel out of the water, and took measures to preserve her equipment and machinery. (*Id.* at 180). At that point, Sablotsky told Fernandez via text message that the yacht "may have hit the bottom on the way out of the canal" a month before, that it "basically felt like it just touched the bottom," and that she just "kept going." (ECF No. 71-1 at 19).

Kol B'Seder filed an insurance claim with Underwriters that day. (ECF No. 53-1 at 92; ECF No. 71-1 at 10). Agnes Henderson of York Risk Services Group ("York"), the Underwriters' Third Party Administrator, handled the claim. (ECF 51-1 at 4.). Henderson called Sablotsky to find out if there had been an incident leading to the *Sababa*'s partial submersion, and Sablotsky told her that she did not remember grounding the vessel. (*Id.* at 14). Sablotsky later said the same thing to York's surveyor, Stuart Hutchinson.[6] (ECF No. 68-3 at 20-21; ECF No. 68-6 at 1).

Hutchinson surveyed the vessel on May 3, 2016. (ECF No. 68-6). He concluded, *inter alia*, the following:

> Firstly, the design and installation of external rudder logs is poor.
>
> This is not an uncommon failure.
>
> It is my professional opinion that the external rudder and rudder log have been subjected to hydraulic forces over time, which contributed to or caused the tabbing holding the starboard rudder log to progressively fracture. Fastener penetrations and plumbing penetrations contributed to the transom becoming overly saturated.
>
> Some of the repairs performed in 2008 failed, when the rudder log came adrift and moved aft causing transferred fatigue to tabbing on the inside rudder shelf.

---

[6] Hutchinson testified that "[t]he characteristics, the nature of the patterns didn't support [a grounding]. So if she told me she heard grounding, I would have been very skeptical of that because there was no evidence of a grounding, nothing consistent with a grounding, no nicks in the rudder." (ECF No. 68-3 at 68-69).

4

> It is my professional opinion that water had been ingressing the bilges in the engine space for some time thru the starboard rudder log and penetrations for the trim tab hydraulic plumbing.
>
> The bilge pumps have in the past dewatered the vessel because the vessel was plugged into shore power and the battery bank feeding power to such pumps was constant.
>
> When the vessel was delivered to [Glass-Tech], the vessel was not plugged into shore power and the ingression of water overcame the available battery charge and rendered the pumps useless.
>
> The steady ingression of water continued unimpeded and finally partially flooded the vessel.
>
> Despite the above, it is possible that sometime in the past the vessel rested on the bottom and the rudders may have been in the mud. The weight of the vessel may have cause the starboard rudder log tabbing to start fracturing. Then, over time, the salt water weeping into the underlying laminates weakened the laminates further and the water pressure pulled the rudder log backwards.
>
> The fractured laminates certainly did not happen suddenly or whilst the vessel was at [Glass-Tech].
>
> The stained condition of the rudder shelf and corroded hydraulic pumping fixtures as well as water stains around the inside rudder log on the rudder shelf was open and obvious and a prudent owner should have attended to this immediately.
>
> The fact that the interior tabbing around the port rudder is starting to let go and the transom laminates show a high moisture reading is also an indication that the port side log is about to fail.

(*Id.* at 7-8).

Based in part on Hutchinson's survey report, Underwriters denied Kol B'Seder's claim. (ECF No. 54-1 at 10). Henderson testified that "we usually look for coverage on claims, but on this loss, there were three to four areas that had specific exclusions on, and I couldn't see the offering coverage on it. So my recommendation was to deny the claim." (ECF No. 51-1 at 23). Paul Marks, another adjustor who worked on the claim, likewise testified, "we are looking for positive coverage offered by the policy is for direct accidental physical loss of damage during the period of insurance. So we reviewed the survey report for evidence of that accidental physical

5

loss of damage first, and when we cannot find any, as we couldn't in this particular case, we then begin to review the exclusions which state that a loss caused directly or indirectly by one of these exclusions is not covered." (ECF No. 54-1 at 47).

On May 12, 2016, Henderson informed Kol B'Seder of Underwriters' decision.[7] (ECF No. 51-2). She cited, and Underwriters now relies on, four Policy exclusions to justify the determination:

> We do not provide coverage under Section 1 (Hull) for losses or damages arising directly or indirectly from:
>
> . . . .
>
> C. Wear and tear, gradual deterioration, osmosis, wet or dry rot, corrosion. Weathering, marring, scratching, denting, vermin, pets or marine life, or electrolytics or galvanic action;
>
> D. Manufacturer's defects or defects in design;
>
> . . . .
>
> K. Any claims caused by or arising out of the unseaworthiness or lack of repair of Your Boat caused by the lack of reasonable care and due diligence in the safeguard or maintenance of Your Boat by You or any other party in control of Your Boat with Your Authority;
>
> . . . .
>
> T. Negligence or breach of contract in respect of any repair or alteration work carried out for Your account or in respect of the maintenance of Your Boat.

(*Id.* at 3-4).

Kol B'Seder filed suit against Underwriters and Glass-Tech on June 16, 2016. (ECF No. 1). Against Underwriters, it presses a claim for breach of contract. (ECF No. 76 ¶¶ 15-18). Against Glass Tech, it presses claims for breach of contract (*Id.* ¶¶ 19-21), breach of the warranty of workmanlike performance (*Id.* ¶¶ 22-24), and negligence (*Id.* ¶¶ 25-27).

Glass-Tech countersued Kol B'Seder for negligence (ECF No. 17 ¶¶ 53-62)

---

[7] Upon learning that Underwriters was denying the claim, Sablotsky told Fernandez via text message that she was "so pissed" that the "boat is going to be there for a long time," and that "I should fix the rudder . . . [t]ake it out and run it aground" so she could file another claim. (ECF No. 71-1 at 60-61).

6

and breach of contract (*Id.* ¶¶ 63-69).[8] It bases its claims on its repair contract, which contemplated that Glass-Tech could recover from Kol B'Seder for damage caused by its negligence:

> 8. Liability of Owner: The Owner agrees to protect, indemnify, and hold harmless Glass-Tech, its agents and employees from and against any and all claims, demands, damages, suits, losses, attorney fees, liability, awards, judgments and expenses of any nature for damage to property or for injury to any person or persons resulting from or in any way arising out of the negligent acts or omission of the Owner or his agents while on the premises of Glass-Tech and Glass-Tech is hereby given a lien on the vessel for such costs.

(ECF No. 17-1 at 4 ¶ 8).

## STANDARD OF REVIEW

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id*.

---

[8] The yacht remained in Glass-Tech's boatyard for weeks accumulating charges. (ECF Nos. 68-7, 71-1 at 72-73). Glass-Tech calculates those charges to total $70,111.92 through January 2017. (ECF No. 68-7 at 2).

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

## DISCUSSION

As noted, both Underwriters and Glass-Tech have filed Motions for Summary Judgment. (ECF Nos. 66, 69). I address each in turn.

### A. Underwriters

Kol B'Seder alleges Underwriters breached the Policy by denying its claim.

The interpretation of insurance policies, like the interpretation of all contracts, is generally a question of law. *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). When interpreting an insurance policy, Florida courts "start with the plain language of the policy, as bargained for by the parties." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) (quoting *Auto–Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). The "Florida Supreme Court has made clear that the language of the policy is the most important factor. Under Florida law, insurance contracts are construed according to their plain meaning." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274–75

(11th Cir. 2008) (internal citations and quotations omitted) (quoting *Taurus Holdings, Inc. v. United States Fid. and Guar. Co.*, 913 So.2d 528, 537 (Fla. 2005)).

Thus, a court interprets policy language according to its "'everyday meaning' as it is 'understandable to the layperson.'" *Ohio Cas. Ins. Co. v. Cont'l Cas. Co.*, 279 F. Supp. 2d 1281, 1283 (S.D. Fla. 2003) (quoting *Hrynkiw v. Allstate Floridian Ins. Co.*, 844 So. 2d 739, 741 (Fla. Ct. App. 2003)). If "the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as written." *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004); *see also Steinberg*, 393 F.3d at 1230 (court must read policy as a whole and give every provision its full meaning and operative effect). This maxim applies equally to exclusions – if an exclusionary provision is unambiguous, a court must apply the exclusion as written. *Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1139 (Fla. 1998) ("[A] court cannot place limitations upon the plain language of a policy exclusion."); *see Steinberg*, 393 F.3d at 1230 ("If [the policy] language is unambiguous, it governs.").

Consistent with the "guiding principle" that "insurance contracts must be construed in accordance with the plain language of the policy," only when the relevant policy language is "susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage" will the language be considered ambiguous and, thus, construed in favor of coverage. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla.2003). For this principle to apply, there must be a "genuine inconsistency, uncertainty, or ambiguity in meaning"; the principle does "not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* at 165; *see also Jefferson Ins. Co. of New York v. Sea World of Florida, Inc.*, 586 So. 2d 95, 97 (Fla. Ct. App. 1991) (courts are not authorized "to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity").

Here, the four policy exclusions on which Underwriters relies plainly state that the Policy provided no coverage for the kind of "losses or damages" Kol B'Seder

suffered when the *Sababa* partially submerged. (ECF No. 51-2 at 3). Exclusion "C" excludes from coverage "[w]ear and tear, gradual deterioration, osmosis, wet or dry rot, corrosion. Weathering, marring, scratching, denting, vermin, pets or marine life, or electrolytics or galvanic action." (*Id.* at 4). The evidence shows the vessel's problems arose, at least in part, from: (1) hydraulic forces the external rudder and rudder log underwent "over time" (ECF No. 68-6 at 7); (2) "water [that] had been ingressing the bilges in the engine space for some time thru the starboard rudder log and penetrations for the trim tab hydraulic plumbing" (*Id.*); (3) water weeping into the underlying laminates "over time" (*Id.* at 8); and (4) fractured laminates that "certainly did not happen suddenly or whilst the vessel was at [Glass-Tech]." (*Id.*).

Exclusion "D" excludes from coverage "[m]anufacturer's defects or defects in design." (ECF No. 51-2 at 4). The evidence shows that vessel's problems arose, at least in part, from "the design and installation of external rudder logs." (ECF No. 68-6 at 7).

Exclusion "K" excludes from coverage "[a]ny claims caused by or arising out of the unseaworthiness or lack of repair of Your Boat caused by the lack of reasonable care and due diligence in the safeguard or maintenance of Your Boat by You or any other party in control of Your Boat with Your Authority." (ECF No. 51-2 at 4). The evidence shows the vessel's problems arose, at least in part, from: (1) Kol B'Seder's failure to attend to "open and obvious" signs that the *Sababa* was in deteriorating condition (ECF No. 68-6 at 8); (2) Kol B'Seder's failure to have the *Sababa* hauled out and repaired on a timely basis (ECF No. 53-1 at 34-43, 135-40); and (3) Sablotsky's's failure to ensure that the vessel was plugged into shore power when she left it at the Glass-Tech boatyard (ECF No. 68-2 at 84-85).

Exclusion "T" excludes from coverage "[n]egligence or breach of contract in respect of any repair or alteration work carried out for Your account or in respect of the maintenance of Your Boat." (ECF No. 5-1 at 4). The evidence shows the vessel's problems arose, at least in part, from: (1) Kol B'Seder's failure to have the *Sababa* hauled out and repaired on a timely basis (ECF No. 53-1 at 34-43, 135-40); and (2) failure of repairs performed in 2008 (ECF No. 68-6 at 8).

Kol B'Seder tries to circumvent these exclusions by arguing that there remains

10

a question of fact as to the actual cause of the *Sababa*'s partial submersion. Specifically, Kol B'Seder asserts that the vessel's problems may have resulted from its alleged grounding a month earlier. But the evidence that the yacht grounded is weak. Sablotsky changed her account of the incident over time, telling Fernandez one thing and Underwriters another. More importantly, she admitted to Fernandez that she does not really know whether the *Sababa* grounded, telling him only that it "may have hit the bottom." (ECF No. 71-1 at 19). She also testified that she thought she just "kicked up some mud" (ECF 53-1 at 69), and so made no effort to determine whether she had damaged the vessel. (*Id.* at 70-71). The fact that Hutchinson found no evidence of grounding (ECF No. 68-3 at 68-69) supports Sablotsky's contemporaneous judgment that she had merely "lightly touched" the bottom, if at all. (ECF No. 53-1 at 63).

In sum, the evidence is overwhelming that the *Sababa*'s partial submersion arose from causes falling within the scope of the Policy exclusions on which Underwriters relies. No reasonable jury could find otherwise. *See Damon*, 196 F.3d at 1358. Summary judgment in Underwriters' favor is therefore appropriate.

### B. Glass-Tech

Kol B'Seder also asserts claims against Glass-Tech for breach of contract, breach of the warranty of workmanlike performance, and negligence.

"To make out a prima facie case of maritime negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff 'under the law to conform to a particular standard of conduct in order to protect others against an unreasonable risk of harm,' that the defendant breached such duty, and that the breach harmed plaintiff in a manner that the duty of reasonable care seeks to prevent. *Stuart Cay Marina v. M/V Special Delivery*, 510 F. Supp. 2d 1063, 1070-71 (S.D. Fla. 2007). The implied warranty of workmanlike performance parallels a negligence standard. *La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.*, 124 F.3d 10, 16 (1st Cir. 1997)). *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). Thus, Kol B'Seder must prove that: (1) Glass-Tech owed it a duty to protect against a particular harm; (2) Glass-Tech breached that duty; (3) the breach actually and proximately caused the

Kol B'Seder's injury; and (4) Kol B'Seder suffered actual harm. *Id.* (citing *Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008)).

The elements of a breach of contract claim under Florida law and admiralty law are the same: existence of a valid contract, a material breach, and damages. *See Sulkin v. All Fla. Pain Mgm't Inc.*, 932 So. 2d 485, 486 (Fla. 4th DC A 2006); *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005). Before an action for breach of contract can be sustained, there must be an enforceable contract." *Bus. Specialists, Inc. v. Land & Sea Petroleum, Inc.*, 25 So. 3d 693, 695 (Fla. Ct. App. 2010). "[A] meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract." *Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 228 (Fla. Ct. App. 2005) (internal quotation marks omitted).

Here, Kol B'Seder alleges Glass-Tech was negligent and/or breached its repair contract in two respects: (1) it failed to haul the *Sababa* out of the water on April 29, 2017, as purportedly agreed; and (2) it failed to connect the *Sababa* to shore power, which rendered the bilge pumps ineffective to combat the steady ingress of water that partially submerged the vessel. Both allegations are baseless.

The evidence is clear that Sablotsky was aware of and agreed to Glass-Tech's plan to haul out the *Sababa* on the Monday following Sablotsky's delivery of the vessel to the Glass-Tech boatyard. Fernandez made that plan clear in his text messages to Sablotsky, stating, "I may not be able to haul till Monday. But it will at least be there and so we can haul it Monday." He further explained, "u also have other boats [we're] moving so it depends how it falls in the sequence. This is like a big jig saw puzzle. Fitting the boats." (ECF No. 71-1 at 2). Sablotsky could not reasonably have understood Fernandez's messages to mean he promised to haul out the yacht before the weekend. Indeed, Sablotsky herself admits that was not her understanding: "I was trying to get it hauled on that day. And the text messages are clear. [Fernandez] said he was going to try, and then if I got there before a certain time, it was – he would – he thought he'd be able to do it. *But he said he may not be able to do it until Monday.*" (ECF 53-1 at 89) (emphasis added).

The evidence is equally clear that Glass-Tech never assumed responsibility for

plugging the *Sababa* into shore power. Nothing in Glass-Tech's repair contract with Kol B'Seder required it to do so, Sablotsky never asked Glass-Tech to do so, and Glass-Tech never said that it would do so. Even if Glass-Tech was somehow obliged to connect the *Sababa* to shore power that weekend, it is not clear from the record that a lack of power to the bilge pumps actually caused the vessel partially to submerge. Hutchinson's survey report details several mechanical problems that afflicted the *Sababa*, all of which contributed to its fate. (ECF No. 68-6). Underlying each of those problems is the salient fact that Sablotsky had not hauled the vessel out for repairs for more than three years before taking it to Glass-Tech, even though its problems should have been "open and obvious" to "a prudent owner." (*Id.* at 8).

In short, the evidence leaves no doubt that the *Sababa*'s partial submersion resulted from Sablotsky's neglect, not from any failure on Glass-Tech's part. That conclusion compels me to grant Glass-Tech's Motion as to Kol B'Seder's claims against it, and also to grant Glass-Tech's Motion as to its counterclaim. The repair contract allows Glass-Tech to recover from Kol B'Seder for damage caused by its negligence. (ECF No. 17-1 at 4 ¶ 8). According to Glass-Tech, Kol B'Seder has accumulated $70,111.92 in charges through January 2017 as a result of the partial submersion, haul-out, and salvage of the *Sababa*. (ECF No. 68-7 at 2). Glass-Tech is entitled to compensation in that amount, plus any additional charges it can document.

## CONCLUSION

It is, therefore, **ORDERED** and **ADJUDGED** that (1) Certain Underwriters' Motion for Final Summary Judgment (ECF No. 66), and (2) Glass-Tech's Motion for Summary Judgment Against Plaintiff & Motion for Summary Judgment Against Counter-Defendant (ECF No. 69) are **GRANTED**. The Clerk shall **CLOSE** this case. All pending motions, if any, are **DENIED** *as moot*.

**DONE** and **ORDERED** in chambers at Miami, Florida, this 30th day of May 2017.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*